UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Russell, Malveaux and Senior Judge Clements
Argued by teleconference

JULIAN MORRISON

MEMORANDUM OPINION[*] BY
v.      Record No. 1620-19-4      JUDGE WESLEY G. RUSSELL, JR.
JULY 28, 2020

JACI MORRISON

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Dontae L. Bugg, Judge

Catherine S. Croft (Farrell & Croft, P.C., on briefs), for appellant.

Amy N. Tobias (Claire T. Salitsky; Dougherty Tobias Iszard
Northern Virginia Law, P.C., on brief), for appellee.

Julian Morrison, husband, appeals the trial court's final decree of divorce awarding Jaci

Morrison, wife, monthly spousal and child support.  Husband specifically argues that the trial court

erred in calculating the parties' income and thereby erred in establishing the amount of support.

Additionally, he argues that the trial court erred by prospectively modifying the child support award

based on an event that will occur in the future.  Finally, he challenges the decree's provision

requiring him to maintain an existing life insurance policy.  For the following reasons, we affirm the

judgment of the trial court.

BACKGROUND

"When reviewing a trial court's decision on appeal, 'we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences.'"

Brandau v. Brandau, 52 Va. App. 632, 635 (2008) (quoting Smith v. Smith, 43 Va. App. 279,

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

282 (2004)). "That principle requires us to discard the evidence of the appellant which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." Id. (quoting Petry v. Petry, 41 Va. App. 782, 786 (2003)).

The parties married in August 1998, had three children, and separated in August 2017. Wife filed a complaint for divorce in May 2018. At the commencement of the proceedings, the parties' daughter was age twelve and their sons were eleven and six years old.

When the parties married in 1998, wife was entering law school; husband had an established career as a pilot. Wife had some summer employment while she was a student but was otherwise unemployed. When wife graduated from law school in 2001, she took and passed the bar examination, but did not seek employment as a practicing attorney. Instead, wife and husband elected to pursue real estate ventures so that they could spend time together when husband was not flying. At various times, wife worked on a limited basis as a real estate agent, loan processor, and title insurance sales associate.

When their first child was born in 2005, wife had been employed for several years as a real estate agent for Coldwell Banker, where she worked on a commission basis. She stopped working for that company, and husband took family, medical, and voluntary leave from United Airlines, where he was employed. Over the next few years, husband started a title insurance company and then a snowplow company. Wife continued with the loan processing and assisted husband with the title work, all on a commission basis. Wife sometimes also performed administrative duties for the snowplow business. Ultimately, the business ventures stopped, and husband returned to full-time flying for United Airlines in 2010. Wife never worked full time outside of the home; she provided for the care of the children, whom the parties, based on husband's insistence, had decided to homeschool.

Difficulties within the marriage led to the parties living separately in the same house in late 2017. In January 2018, wife presented husband with a separation agreement; husband hired counsel and responded to the proposal that April. Wife filed for divorce in May 2018, and, on the day husband was served with the complaint, the parties had an argument after husband found wife looking for documents in his bedroom. Wife ultimately called the police, alleging that husband had physically abused her. Husband was arrested but released the next day. Upon his release, husband called United Airlines and requested to be put on the sick list, asserting that he was in no condition to fly. A protective order was issued against husband, and he sought counseling. Husband was diagnosed with depression and prescribed the medication Doxepin, which he continued to take throughout the proceedings.

In July 2018, the parties reached a *pendente lite* agreement regarding custody and support. Husband agreed to pay wife $2,240 in spousal support and $1,977 in child support each month. These *pendente lite* amounts were agreed upon "based on [husband's] representation that he will no longer be paid his salary by United Airlines for the period beginning July 1, 2018, and that he . . . expects to receive long term disability which is capped at . . . $8,000 per month."

The parties were able to reach agreements regarding a final division of their property and the custody arrangements for the children. Their property settlement agreement, dated December 28, 2018, required husband to pay wife $322,567 within nine months for her interest in the real estate and vehicles that husband was to retain. Husband also was required to pay wife roughly $260,000 of his retirement savings and, upon receipt, 50% of his United Airlines' pension.

By consent order entered January 4, 2019, the parties agreed that they would share joint legal custody of the children and that wife would have primary physical custody with husband having parenting time every Wednesday afternoon and every other Friday and Sunday as well as alternating weeks with the boys during the summer. The parties agreed that all three children would

continue to be homeschooled for the remainder of the academic year, but that the following year, the two sons would attend public school. Wife was to continue homeschooling their daughter.

The trial court conducted a two-day *ore tenus* hearing on April 30 and May 1, 2019, on the unresolved issues of spousal support, child support, and life insurance. Mainly at issue were the respective incomes of the parties. The parties presented documentary as well as testimonial evidence in support of their positions.

With respect to husband's income, wife introduced his 2017 W-2, which showed a gross income of $343,847.83. Also admitted were pay statements from United Airlines, which showed that husband had received $214,000 from United Airlines in 2018 before the end of May and received a total of $254,256.76 in gross pay from United Airlines in 2018. A 2019 pay statement introduced in evidence demonstrated that husband continued to receive significant income from United Airlines in 2019. The payments reflected on the United Airlines pay statements did not include the $8,000 a month in disability insurance payments that husband began receiving in September 2018.

Husband acknowledged that he continued to receive sums from United Airlines despite having stopped flying in 2018. He testified that the monies were due to his cashing out unused sick and vacation time that he had accrued and that such funds would no longer be available to him going forward. He further explained that so long as he was taking Doxepin and suffering from depression, he would be unable to fly and that, even upon resolution of the underlying issue, it was uncertain when he would be able to reacquire the medical certification required by the FAA to resume flying. As such, husband stated that the only income he would have for the foreseeable future was the $8,000 he was receiving in disability payments every month.

Husband's psychiatrist, Dr. James Rives, testified to his diagnosis and treatment of husband. He relayed that he first encountered husband in May 2018. His initial diagnosis was adjustment

- 4 -

disorder with depressive features based on husband's report of depression issues due to stress. After considering husband's accounts of a previous depressive episode in 1988 and continuing to evaluate husband over time, Dr. Rives amended his diagnosis to recurrent major depression. Dr. Rives acknowledged that, although there are numerous treatments for depression, he prescribed, in addition to therapy, Doxepin because that is what husband had told him he successfully had used when he sought treatment in 1988.[1] Based on progress he had been observing, Dr. Rives estimated that husband's depression would be alleviated by July 2019, three months from the time of the hearing.

Dr. John Riccitello, a medical director with Aviation Medicine Advisory Service who advises pilots as to FAA medical certification issues, confirmed that pilots were barred from flying if they were taking Doxepin. He conceded that other depression medications, including SSRIs, were permitted and that a pilot could get a waiver for the medical certification requirement. He indicated that waiver applications were rarely denied. He noted that, irrespective of a valid certification, it was a pilot's responsibility to ensure he was physically and mentally fit to fly.

At the time of trial, wife was unemployed outside of the home with most of her time spent serving the needs of the children.[2] In addition to being the primary custodial parent, she was responsible for homeschooling. She testified to the demands of her schedule with respect to the children's educational and extracurricular needs. She estimated that she could work three hours in the afternoon on Mondays, Tuesdays, and Thursdays; from 10:30 a.m. to 6:00 p.m. on Wednesdays; from 10:30 a.m. to 3:30 p.m. on Fridays; and every other weekend, provided husband maintained

---

[1] Dr. Rives was asked about other medications, specifically SSRIs, which have become more common in the treatment of depression since 1988. Although defending his choice of Doxepin, Dr. Rives conceded that he "would not have started [husband] on [Doxepin] had he not reported" having been on it previously.

[2] The parties stipulated that wife had "no physical or mental condition that impacts her earning capacity, obligations, financial resources, or creates a special need."

his visitation schedule. She also relayed what steps she would need to take to secure future employment. She estimated that it would cost her $2,000 to fulfill the CLE credits required to reinstate her law license. Husband argued that wife was voluntarily unemployed, requiring the trial court to impute income to her.

Both parties called vocational experts to testify regarding wife's potential earning capacity. Husband's expert opined that wife was qualified for jobs ranging from administrative assistant to lawyer, with initial salaries ranging from $36,000 as an administrative assistant to $81,000 as an entry-level attorney, and the expectation being that the salaries would be significantly higher within five to seven years regardless of the specific position she chose. The expert noted that, for some of the positions, it was unlikely that they would provide very flexible hours.

Wife's expert agreed that, in the abstract, wife likely could be employable in a clerical position or as a "legal assistant/attorney hybrid" with potential salaries falling between $32,000 and $50,000. Although acknowledging the possibility that wife could practice law, the expert discounted that possibility given her lack of experience even if she were to renew her license. Wife's expert opined that wife's "employability drops off a cliff with [her stated] schedule."

Both experts acknowledged that, to find employment, wife would have to acquire additional skills and training, which would require time and money. Neither expert was aware of any positions suitable for her availability given the schedule she maintained for the benefit of the children.

Husband acknowledged that he held two life insurance policies with Met Life, one on his life and one on wife's life, and that they were in place prior to separation. He testified that the face value of the policy on his life was $2 million and that wife was the sole named beneficiary up until the time of separation, after which husband changed the policy to also name the children as equal-share beneficiaries. Husband testified that he was paying $644 a month for the insurance premiums.

In her closing argument, wife asserted that "[t]he main issues . . . are the incomes of both of these parties" and that "[t]here was a request by both sides to find that the other is voluntarily unemployed and to impute income." Asserting that "there is evidence of some malingering [by husband] here," wife reiterated, "with regard to [husband's] income[,] obviously we are also seeking an imputation of income . . . ." Husband emphasized wife's failure to search for employment despite the capabilities the vocational experts reported, and therefore, asked that income be imputed to wife. The trial court took the matter under advisement.

The trial court issued its ruling from the bench on June 28, 2019. The trial court noted it had considered the factors contained in Code § 20-107.1(E) and then recited its findings with respect to each factor. The trial court specifically informed the parties that if it did not "mention a factor" in detailing its ruling it was "not because [the trial court had] not considered it." Before addressing specific statutory factors and the role each played in its decision, the trial court advised the parties that "if either party has questions about what weight [the trial court] gave a particular factor or [its] thoughts on a particular factor, please feel free to ask."

The trial court then addressed its view of the evidence and the thirteen statutory factors. In its discussion of the statutory factors, the trial court covered many topics, including the parties' property settlement agreement; their respective financial situations and resources; their health, including husband's diagnosis of depression; their earning capacities; and the circumstances regarding the children that affected wife's ability to work outside of the home. The trial court highlighted the parties' decision regarding homeschooling, noting that teaching the parties' daughter and other custodial responsibilities regarding the sons "make full-time employment outside of the home unrealistic at this time for" wife. The trial court noted that the decision to homeschool caused wife to have "been out of the workforce" for some time, diminishing her earning potential. The trial

court concluded that for wife to be able to engage in full-time employment outside of the home, she would need to acquire additional training.

The trial court then announced its judgment regarding spousal support. It awarded wife periodic spousal support for ten years, representing one year less than half the duration of the marriage. Husband was directed to pay $4,000 per month for the first year and $3,000 per month every year thereafter. Having announced the spousal support ruling, the trial court asked the parties whether they had any questions "before [the trial court] move[d] on to the next portion of the ruling[.]" Each party answered that they had no questions.

Turning to child support, the trial court noted that husband's child support obligation "ha[d] been determined by the application of the child support guidelines." For purposes of the guidelines and, in light of its ruling that spousal support would reduce after one year, the trial court set husband's monthly income for the first year at $17,188 and set wife's monthly income at $4,086. Given the reduction in spousal support that would occur at the end of the first year, the trial court determined that "those numbers would shift to $18,188 per month for [husband] and $3,086 per month for [wife]" after the first year.[3] The trial court noted husband's $140 monthly payment for the children's medical insurance. Based on these numbers, the trial court concluded that the presumptive amount of monthly child support owed was $2,140.69 for the first year, then $2,315.95 for the nine years following the reduction in spousal support. The trial court closed the child support discussion by inquiring, "Are there any questions by either party as to [its] ruling as it relates to child support?" Neither party asked any questions.

The trial court also ordered husband to "maintain the existing life insurance policy through Metropolitan Life Insurance Company . . . with a face value of . . . $2,000,000" for as long as his

---

[3] In determining husband's income for the purposes of child support, the trial court began with the income figure it had used for calculating spousal support and reduced it by the amount that it had ordered husband to pay in spousal support.

support obligations were extant. The trial court ordered that wife be made "at least a 19% beneficiary of that policy" but allowed husband to reduce that percentage going forward "as spousal support payments are made, so long as [the new] percentage is sufficient to cover the remaining amount due [wife] in spousal support." The trial court further ordered that "the minor children collectively [be named] as beneficiaries at a minimum of 25%" of the policy's value. This requirement was to remain in place "so long as a child support obligation remains" but husband can "remove individual children . . . as each child emancipates and the child support obligation for that child ceases."

Husband filed a motion to reconsider on September 3, 2019. In his motion, husband alleged that the trial court had erred in failing to determine his "actual gross monthly income prior to imputing income to him[,]" in imputing income to him without sufficient evidence, in not imputing income to wife, in prospectively modifying child support, and in ordering him to maintain a $2 million life insurance policy without sufficient evidence regarding the policy and "when her insurable interest is less than $2 million." Along with the motion, husband presented a draft suspending order, but the trial court did not enter it.

Without addressing husband's motion, the trial court memorialized its ruling in a final decree of divorce entered September 4, 2019. The final decree expressly noted that its award of child support was determined by use of the guidelines. The trial court attached the guidelines worksheets to the final decree as exhibits.

Husband noted his objections to the final decree, asserting the trial court erred in the following ways: by imputing income to husband; by calculating child support using imputed income without first determining his actual income; by not imputing income to wife; and by ordering him to maintain the life insurance "in excess of [the] insurable amount and without considering factors set forth in [the] Code and as otherwise set forth in the [m]otion to [r]econsider."

Wife also objected to the final decree, asserting that the trial court "failed to impute income to [husband] at his prior earning capacity . . . before . . . he . . . refused to continue flying planes . . . ."

Husband then noted his appeal to this Court, asserting the following alleged errors:

1. The trial "[c]ourt erred in failing to first determine [husband's] actual gross monthly income prior to imputing income to him when calculating child and spousal support";

2. The trial "[c]ourt erred in imputing income to [husband] as there was insufficient evidence to do so";

3. The trial "[c]ourt erred in not imputing any income to [wife] despite testimony from experts on behalf of both parties and [wife's] assertion that she could be working and earning income";

4. The trial "[c]ourt erred in prospectively modifying child support"; and

5. The trial "[c]ourt erred in ordering [husband] to maintain a $2 million life insurance policy on [wife] when her insurable interest is less than $2 million and there was insufficient evidence regarding the policy upon which to base its ruling."

ANALYSIS

"We begin our analysis by recognizing the well-established principle that all trial court rulings come to an appellate court with a presumption of correctness." Niblett v. Niblett, 65 Va. App. 616, 623 (2015) (quoting Stiles v. Stiles, 48 Va. App. 449, 453 (2006)). "[T]he party who asserts the contrary is required to overcome the presumption by record proof." Hart v. Hart, 27 Va. App. 46, 70 (1998) (quoting Broom v. Broom, 15 Va. App. 497, 504 (1992)). "[W]hen the [trial] court hears evidence *ore tenus*[,] its findings are entitled to the weight of a jury verdict and will not be disturbed unless they are plainly wrong or without evidence to support them." Collins v. Leeds, 69 Va. App. 1, 12 (2018) (quoting Lapidus v. Lapidus, 226 Va. 575, 580 (1984)). Moreover, it is exclusively the province of a trial court to "ascertain[] . . . witness' credibility [and] determine[] the weight to be given to" each witness' testimony. Wright v. Wright, 61 Va. App. 432, 450 (2013) (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*)). Accordingly, a

trial court is free, as factfinder, "to accept or reject any of the witness' testimony." Id. (quoting Street, 25 Va. App. at 387).

## I. Determination of husband's income

Husband correctly asserts that, prior to crafting either its spousal or child support awards, the trial court was required to determine his income. Code §§ 20-107.1 and 20-108.1. Only after determining a party's actual income may a trial court determine that additional income should be imputed or that deviation from the child support guidelines is warranted. Husband asserts that the trial court failed to determine his actual income correctly, ignoring his evidence that his actual income at the time of the hearing was limited to $8,000 a month in disability payments. It is husband's contention that, absent imputation, the evidence only allowed a conclusion that his income was $8,000 a month. We disagree.

"The issue of husband's income is a question of fact, and the judgment of the [trial] court on questions of fact is entitled to great weight and will not be disturbed unless it is plainly wrong or without evidence to support it." Patel v. Patel, 61 Va. App. 714, 727 (2013) (internal quotation marks and citation omitted); see also Milam v. Milam, 65 Va. App. 439, 462 (2015) (holding that "[t]he issue of a party's income is a question of fact that we will not disturb unless it is plainly wrong or without evidence to support it"). Although the trial court did not expressly state in its bench ruling what it had determined husband's income to be, the child support guidelines worksheets attached to the final decree indicate that the trial court found husband's monthly gross income to be $21,188, which totals $254,256 per year. Accordingly, if the record contains evidence that would allow a reasonable factfinder to determine that husband's income was $21,188 a month as opposed to $8,000 a month, we must affirm the trial court's income determination.

The evidence of husband's income and factors affecting it was not limited to his evidence that his sole source of income was the disability payments. The evidence established that

- 11 -

husband's income in 2017 was $343,847.83. Further evidence established that husband received payments from United Airlines of $254,256.76 in 2018. That amount did not include the monthly $8,000 disability insurance payments that husband began to receive in September 2018, meaning husband's income in 2018 was significantly more than the $254,256.76 he received directly from United Airlines that year. In the four months of 2019 before trial, the evidence established that husband received continued disability payments of $8,000 a month but also received substantial, additional payments from United Airlines in that period.[4] Further complicating the question of husband's income was the fact that, according to his own expert psychiatrist, husband's depression, the ostensible cause of his inability to fly for the airline, likely was temporary and, to a reasonable degree of medical certainty, should resolve by July 2019, a mere three months after the hearing.

From this mélange of data and information, the trial court determined husband's income to be $21,188 a month. The trial court did not pull the number from the air. The amount represented the income husband received from United Airlines (and only United Airlines) in 2018, the last full year before the trial and a year in which husband was able to fly for part of the year and was disabled for part of the year. Given all of the evidence, including that husband had continued to receive substantial income from United Airlines in the first part of 2019 and that husband's own expert testified that the condition which prevented him from flying was on pace to resolve by July 2019, we cannot say that the trial court's selection of this figure was plainly wrong. Accordingly,

---

[4] Wife introduced a United Airlines pay statement reflecting husband's non-disability earnings for the period of December 30, 2018 through January 29, 2019. It indicates that husband was paid $24,615.13 in "earnings" minus a recoupment of a "Flight Advance" of $12,315.45, resulting in $11,631.43 of gross income being paid to husband for the described period. The pay statement, which was issued on February 15, 2019, also contains a line item for year-to-date payments; it indicates that, as of that date, husband's gross income from United Airlines in 2019 was $44,777.01. This amount was in addition to the $8,000 a month in disability insurance payments husband was receiving at that time.

because there is a basis in the evidence for the trial court's determination of husband's income, we must affirm that conclusion. Patel, 61 Va. App. at 727; Milam, 65 Va. App. at 462.

Despite the evidentiary basis for the trial court's conclusion, husband argues that the trial court was required to initially set his income at $8,000 a month, the amount of the disability insurance payments he was receiving. He argues that, to do otherwise, fails to consider his actual income at the time of the hearing and ignores his evidence that those payments were his only source of income. In essence, husband argues that the trial court was required to accept his testimony that he expected the disability payments would constitute all of his income going forward and to ignore other sources that had provided income previously, including as recently as less than two months before the trial.

Although a trial court is tasked with determining a party's income at the time of trial, we have never suggested, as husband seems to, that a trial court cannot consider historical evidence of income in calculating current income. Incomes fluctuate over time for multiple reasons, including changes in health, the seasonal nature of certain professions, and even random chance. Because of this, we have never required that a trial court make a determination of a party's income on the day of trial, but rather, have allowed courts to consider the available information regarding income to make a reasonable determination. For example, in Patel, the trial court determined husband's income for the purposes of spousal support by adopting an expert's methodology that "used a three-year average [of husband's income], from 2008 to 2010[.]" 61 Va. App. at 727. We affirmed the income determination and subsequent spousal support award even though the final decree of divorce implementing same was not entered until 2012. Id. at 719.

Here, there were many complicating factors related to a determination of husband's income, ranging from his claims of disability stemming from depression, the opinion of his

expert that his depression would resolve shortly after trial, and the fact that he continued to receive payments from United Airlines in 2018 and 2019 in addition to his disability payments. Taking all of this into account, the trial court determined his income to be less than it was in 2017 and 2018, but more than he claimed it would be in 2019. The evidence supported a conclusion that husband would be depressed, and hence disabled, for a portion of 2019, but that he would not be depressed past July. This situation is similar to 2018, a year in which husband suffered disabling depression for a portion of the year, and the trial court used the 2018 payments from his employer to set his income going forward. Although another factfinder could have set the income at a different level, the trial court's decision is a reasonable one based on evidence in the record, and therefore, must be affirmed. Id. at 727; Milam, 65 Va. App. at 462.

Despite this, husband argues that it was still error because he testified that his only source of income going forward was the disability payments and that the additional payments from United Airlines he received in 2018 and 2019 were one-time payments that would not continue.[5] His argument assumes that the trial court was required to accept this testimony as true. It was not.

As noted above, the trial court, sitting as factfinder, was the sole judge of the credibility of the witnesses and was free to reject, in whole or in part, the testimony of any witness. Wright, 61 Va. App. at 450. From the bench, the trial court made clear that its factual determinations were based on its credibility determination and that adverse factual findings could be explained

---

[5] On brief, husband cites to the September 2018 letter from United Airlines to support his claim that his income was limited to the $8,000 a month in disability insurance payments. The letter indicates that United Airlines accepted his claim of disability and that his disability payments were capped at $8,000 a month. However, the letter does not indicate that the disability payments are the only income he will receive from United Airlines while on disability. As noted above, the record reflects that husband continued to receive substantial income from United Airlines in addition to the disability payments in the remainder of 2018 and in the beginning of 2019. Accordingly, the letter does not establish that husband's income was limited in the manner that he claims.

- 14 -

by such credibility determination. Specifically, the trial court informed the parties that it had "observed the [w]itnesses and their demeanors and made determinations as to their credibility[,]" indicating that those determinations could explain why the trial court's view of the facts "differs from a party's view of the facts of the case[.]"

Although the trial court was free to base its credibility determination on demeanor alone, additional factors support doubting husband's monetary claims.[6] The record reflects that, in negotiations leading to the parties entering into an agreed *pendente lite* child support order, husband represented that he would receive no further "salary" from United Airlines and that his income would be limited to the $8,000 a month in disability payments going forward.[7] The record reflects that husband received substantial additional payments from United Airlines in the second half of 2018 and in the first part of 2019, calling husband's credibility on questions related to his income into doubt.

For all of these reasons, we conclude that the trial court did not commit reversible error in setting husband's income at $21,188 a month. Accordingly, its judgment in this regard is affirmed.

## II. Purported imputation of income to husband

In his second assignment of error, husband argues that the trial court erroneously imputed income to him. Specifically, he argues that the trial court erred by "imput[ing] income to

---

[6] Although husband characterized the additional payments from United Airlines as one-time payments of unused sick and vacation time, the faces of the pay statements do not establish that this was the case. In fact, the 2019 pay statement noted that the payment was for 68.25 "Hours WKD[,]" presumably meaning it was pay for 68.25 hours worked.

[7] At oral argument in this Court, husband maintained that the statement was accurate because the payments he continued to receive from United Airlines after entry of the *pendente lite* order were not "salary" but were for other things, and thus, his representations were true. Even accepting that the representations were true in a technical sense, context would allow a reasonable factfinder to conclude that the representations were deceptive, undermining husband's credibility on income issues generally.

[husband] in the amount of $13,188 per month by finding that his income should be $21,188 per month instead of the actual $8,000 per month that he receives."

For the reasons detailed above, husband's second assignment of error is fatally flawed because it is based upon a false premise. Husband argues that the trial court must have imputed income to him because it sets his income level higher than $8,000 a month, the level husband contends the trial court was required to find. As noted above, evidence in the record supported the trial court's conclusion that husband's income was higher than $8,000 a month and, more specifically, was sufficient to support the trial court's decision to set his monthly income at $21,188. Thus, not only does the record not support husband's claim that the trial court impermissibly imputed income to him, but also it establishes that the trial court did not impute income to husband at all. Accordingly, husband's second assignment of error is without merit.

### III. Decision not to impute income to wife

Husband argues the trial court erred in declining to impute income to wife for the purposes of determining spousal and child support. Specifically, he argues that, because the vocational experts testified wife had earning capacity for work outside the home and she "testified that she could work Wednesdays from 2:00 p.m. – 7:00 p.m., or 10 a.m. – 6:00 p.m. and Fridays' from 10:30 a.m. – 3:30 p.m. and Mondays, Tuesdays and Thursdays from 10 a.m. – for three hours[,]" the trial court was required to impute income to her. We disagree.

Although "a [trial] court may impute income to a party who is voluntarily unemployed or underemployed[,]" Budnick v. Budnick, 42 Va. App. 823, 841 (2004) (quoting Calvert v. Calvert, 18 Va. App. 781, 784 (1994)), it is not necessarily required to do so, Murphy v. Murphy, 65 Va. App. 581, 593 (2015) (rejecting the concept of mandatory imputation). Rather, a "trial court's decision whether to impute income rests within its sound discretion and will be reversed only if plainly wrong or not supported by credible evidence." Budnick, 42 Va. App. at 841. "In

evaluating a request to impute income, the trial court must 'consider the [parties'] earning capacity, financial resources, education and training, ability to secure such education and training, and other factors relevant to the equities of the parents and the children.'" O'Hara v. O'Hara, 45 Va. App. 788, 798 (2005) (alteration in original) (quoting Blackburn v. Michael, 30 Va. App. 95, 102 (1999)).

Husband's argument, that the trial court was required to impute income because it was undisputed that wife could work outside the home in some capacity, is one we previously have rejected. In Brandau, 52 Va. App. at 637, a husband essentially argued that "every stay-at-home spouse seeking spousal support must start work outside the home immediately upon the entry of the divorce decree if he or she has any provable income earning capacity." We rejected his argument because there was "no basis for such an inflexible principle in our statutes or caselaw." Id. Rather, we stressed that, in determining whether to impute income to a stay-at-home spouse, the analysis "depends, in part, on a conscientious consideration of all [relevant statutory] factors . . . ." Id. at 638-39.

In detailing its decision, the trial court here emphasized certain facts that augur against imputation. The trial court noted, that as a result of the parties' decision to homeschool their daughter, wife had "been out of the workforce" for some time and that her role of homeschool teacher, coupled with her other parenting responsibilities, made "employment outside of the home unrealistic at this time for" wife. There was nothing unreasonable in the trial court's decision to allow wife to continue to homeschool the parties' daughter without incurring the financial penalty that would have been associated with imputing income to her.[8] Because the trial court's decision

---

[8] The reasonableness of the trial court's decision to allow wife to continue homeschooling the daughter, as set forth in the parties' consent decree, without incurring a financial penalty is underscored by the fact that the homeschooling arrangement was initiated at husband's insistence. He admitted homeschooling was his idea and stressed that wife had acquiesced in his preference for homeschooling "begrudgingly" and that he drug wife "kicking and screaming" into the homeschooling arrangement. It is neither inequitable nor error for the trial

not to impute was reasonable in light of the evidence and its review of the relevant statutory factors, we affirm its judgment in this regard. Budnick, 42 Va. App. at 841.

IV. Change in amount of child support

Husband argues that the trial court erred in ordering child support to be paid in one amount for the first year and in a different amount after that. He contends that this fails to base the child support award on his current income and results in "speculation" by the trial court as to what his income will be after the first year, constituting reversible error. We disagree.

A trial "court's calculation of child support obligations is a combination of mandatory steps and broad discretion." Niblett, 65 Va. App. at 624. "[U]nless it appears from the record that the circuit court judge has abused his discretion by not considering or by misapplying one of the statutory mandates, the child support award will not be reversed on appeal." Id. (quoting Milam, 65 Va. App. at 451).

Husband is correct that child support determinations begin with the determination of the parties' incomes at the time the award is made. In crafting the award, a trial court is to take into consideration the circumstances known to it at that time. This frame of reference, however, does not require a trial court to ignore known future events that are certain to occur. Cf. Wynnycky v. Kozel, 71 Va. App. 177, 196 (2019) (recognizing that the requirement that a trial court base a custody decision on existing circumstances "does not require a circuit court to ignore the future").

Although, as husband suggests, many things, including a return to full-time flying or a continuing disability, had the potential to affect his income one year from the trial court's child support determination, one thing was certain: his spousal support obligation would decrease by

court to decline to impute income to mother for seeking to maintain the status quo regarding her daughter's education when that status quo was created at husband's insistence.

$1,000 a month, leaving him with an additional $1,000 a month in income he otherwise would not have. The trial court was not engaging in speculation that this change would occur; it knew it to a certainty because it had ordered it to be so. Because the decrease in spousal support was a known event that was certain to occur at a time certain, it was not error for the trial court to consider and utilize it in crafting its child support order. Cf. id. at 195-96 (recognizing, in the custody context, that a trial court does not engage in speculation when it accounts for "a known, all but certain event . . . that was reasonably certain to happen at a specific known time" in the future). Accordingly, we affirm the trial court's judgment regarding child support.[9]

## V. Order regarding husband's existing insurance policy

In his final assignment of error, husband asserts that the trial court erred in ordering him to maintain his existing life insurance policy so long as he owed spousal and child support. Specifically, he argues that the requirement that he "maintain a $2,000,000 policy and name [wife] as beneficiary for the entire benefit is unfair and unjust under the circumstances." He further contends that "there was insufficient evidence presented by [wife] regarding the terms of the particular life insurance policy . . . for the [trial c]ourt to . . . order[ him] to maintain that particular policy."

Husband's first argument regarding the insurance issue must be rejected because it is based on a false premise. The trial court did not, as husband contends, order that he "maintain a $2,000,000 policy and name [wife] as beneficiary for the entire benefit[.]" The trial court's order regarding the insurance policy requires him to maintain the policy and that wife be made "at least a 19% beneficiary of that policy[,]" allowing husband to reduce that percentage going forward "as

---

[9] To the extent that the trial court's determination of husband's income as of the date of the hearing or in the year thereafter proves to have been mistaken, the parties have a remedy available. If his actual income proves to be higher or lower than the trial court's determination, either party may seek modification of the spousal and child support awards based on a change in circumstances. Code § 20-108.

spousal support payments are made, so long as [the new] percentage is sufficient to cover the remaining amount due [wife] in spousal support." Underscoring that the trial court did not order that wife be carried on the policy as the "beneficiary for the entire benefit" as husband asserts, the trial court further ordered that "the minor children collectively [be named] as beneficiaries at a minimum of 25%" of the policy's value. This requirement was to remain in place "so long as a child support obligation remains" but husband can "remove individual children [as beneficiaries] . . . as each emancipates and the child support obligation for that child ceases." Clearly, the trial court did not order that husband "maintain a $2,000,000 policy *and* name [wife] as beneficiary for the entire benefit[.]" (Emphasis added). Accordingly, husband's argument in this regard is without merit.

Turning to husband's second argument about the trial court's order regarding insurance, we note that such orders regarding insurance policies are governed by Code § 20-107.1:1. Code § 20-107.1:1(A) provides, in pertinent part, that

> Upon entry of a decree providing for . . . a divorce . . . , where an order for spousal support or separate maintenance has been entered by the court, the court may order a party to (a) maintain any existing life insurance policy on the insured party's life that was purchased during the marriage, . . . provided that the party so ordered has the right to designate a beneficiary and that the payee has been designated as a beneficiary of such policy during the marriage and the payee is a party with an insurable interest pursuant to subsection B of § 38.2-301[10]; [and] (b) designate the other party as beneficiary of all or a portion of the death benefit of such life insurance for so long as the insured party so ordered has an obligation to pay spousal support to the other party, provided that the party so ordered has the right to designate a beneficiary and that the payee has been designated as a beneficiary of such policy during the marriage and the payee is a party with an insurable interest pursuant to subsection B of § 38.2-301 in accordance with the terms of the policy . . . .

---

[10] Husband does not contend that wife did not possess an "insurable interest" as defined in Code § 38.2-301(B).

Here, the evidence established that, during the marriage, husband obtained a $2,000,000 life insurance policy on his life with wife initially named as beneficiary. Although wife initially had been the sole beneficiary, at the time of trial, she was a co-beneficiary with the children having been named equal-share beneficiaries. The evidence established that the policy premium was $644 a month.

Thus, consistent with the requirements of Code § 20-107.1:1(A), the evidence established that husband, the owner of the policy, had in place during the marriage a life insurance policy with wife as the named beneficiary that was sufficient to cover his support obligations to both wife and the children. The trial court's order, consistent with Code § 20-107.1:1(A), only required husband to "maintain" that existing policy.[11] Finally, the trial court's order, permitting husband to adjust the beneficiaries and the respective share of the benefits to which they are entitled as his support obligations change is consistent with the statutory scheme set out in Code § 20-107.1:1. Because the trial court's order requiring husband to maintain the existing life insurance policy he acquired during the marriage is wholly consistent with Code § 20-107.1:1, we affirm the trial court's judgment related to the insurance policy.[12]

---

[11] In the context of insurance policies, we have noted that "[i]n ordinary usage, 'maintain' means 'to keep in a state of repair, efficiency, or validity: preserve from failure or decline[.]' Thus, [an order that a policy be maintained requires the ordered party] 'to keep in a state of . . . validity [and] preserve from failure' [an] existing life insurance polic[y]." Mills v. Mills, 70 Va. App. 362, 376 (2019) (quoting Maintain, Webster's Third New International Dictionary (1981)).

[12] On brief, husband notes that, in ordering a life insurance policy to be maintained, a trial court is required to consider the factors in Code § 20-107.1:1(B). Without fully developing his argument, husband suggests that error can be found in that the trial court "did not articulate that it considered said factors[.]" There is no requirement in Code § 20-107.1:1 that a trial court must state that it considered the Code § 20-107.1:1(B) factors or explain the weight it gave those factors in crafting its order. Furthermore, a full review of the record and the trial court's specific directions regarding the policy, e.g., the ability of husband to change beneficiary distributions as his support obligations change, leads us to conclude that the trial court sufficiently considered the Code § 20-107.1:1(B) factors.

VI. Appellate attorneys' fees and costs

Both parties request that we award them the attorneys' fees they have incurred on appeal. Furthermore, husband requests that we "apportion the printing costs for this appeal between the parties pursuant to Rule 5A:30 of the Rules of the Supreme Court of Virginia."

Absent an agreement between the parties regarding attorneys' fees on appeal, the award of such fees is governed by Rule 5A:30(b). Rule 5A:30(b)(2) provides that "the Court of Appeals may award to a party who has made such request, all of their attorney fees, or any part thereof[.]" "The decision of whether to award attorney[s'] fees and costs incurred on appeal is discretionary." Friedman v. Smith, 68 Va. App. 529, 545 (2018). "In determining whether to make such an award, the Court of Appeals shall not be limited to a consideration of whether a party's position on an issue was frivolous or lacked substantial merit but shall consider all the equities of the case." Rule 5A:30(b)(3). Here, we conclude that the equities of the matter do not dictate that either party be awarded attorneys' fees on appeal. Accordingly, their respective requests are denied with each party being left to pay his or her own attorneys' fees incurred on appeal.

We also deny husband's request to apportion the printing costs between the parties.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

<u>Affirmed.</u>